UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MARLENE JIROUSEK**,                         Case No. 1:12 CV 1829

            Plaintiff,                         Magistrate Judge James R. Knepp II

     v.                                       MEMORANDUM  OPINION  AND
                                         ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

            Defendant.

### INTRODUCTION

Plaintiff Marlene Jirousek seeks judicial review of Defendant Commissioner of Social Security's decision to deny Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. §§ 1383(c)(3) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### BACKGROUND

Procedural History

On April 23, 2007, Plaintiff filed applications for SSI and DIB stating she was disabled due to a nervous breakdown, leg problem, pinched nerve in her lower back, bipolar disorder, degenerative disc disease, and thyroid problems. (Tr. 109, 117, 146). She alleged a disability onset date of spring 2003, later amended to October 12, 2005. (Tr. 35, 109, 117). Her claims were denied initially (Tr. 73, 76, 79) and on reconsideration (Tr. 83, 86, 89). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 92).

Born October 13, 1955, Plaintiff was 54 years old when the hearing was held on March 2, 2010. (Tr. 30, 109). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 24, 30). In her Brief on the Merits, Plaintiff only challenges the ALJ's conclusions on her physical impairments (*see* Doc. 14), and therefore waives any claims about the determinations regarding mental impairments. *See, e.g., Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517–18 (6th Cir. 2010) (noting failure to raise a claim in merits brief constitutes waiver). Therefore, the undersigned only addresses health records pertinent to Plaintiff's physical impairments.

Vocational History and Reports to the Agency

Plaintiff graduated from high school and previously worked as a deli assistant, dishwasher, fast food worker, and packager. (Tr. 133, 272). She stopped working on April 24, 2003 because her husband died, her daughter had behavioral problems, and she was having problems with her back, depression, and bipolar disorder. (Tr. 146).

Plaintiff initially reported she lived in a house alone, but later reports showed she lived with a friend or boyfriend, or in a homeless shelter. (Tr. 171, 193, 262, 388–90, 512, 562, 630). She said on a daily basis she took medication, made coffee, took care of hygiene needs, did household chores such as cleaning and laundry, and cooked simple meals. (Tr. 171–74). At one point, Plaintiff even said she could mow. (Tr. 196). Plaintiff reported she suffered from back and leg pain, leg swelling, lung problems, and mental impairments. (Tr. 172, 176). She explained she could not walk very far without experiencing shortness of breath, stand for long periods without her leg swelling, kneel, reach, or squat. (Tr. 176). She also said she only left the house on the first of the month when food stamps were loaded, explaining a neighbor or family member drove her to the store because she did

not have a car. (Tr. 174). Plaintiff stated her hobbies included watching television, baking, and playing online computer games "all the time" every day. (Tr. 175). She later said her days consisted of taking the dogs out and cooking, getting dressed, cleaning the house, doing laundry, and playing on the computer when she had the energy. (Tr. 194–95). She also said she talked on the phone every day and went to church, her daughter's house, and out to eat. (Tr. 197).

Medical History

Over the years, Plaintiff treated with various physicians for a number of conditions, including hypothyroidism, orthopedic issues, cellulitis, COPD, obstructive sleep apnea, and psychological disorders. (*See, e.g.,* Tr. 245, 253, 301–13, 503, 512, 549, 699). As early as August 23, 2004 – prior to her amended alleged onset date of October 12, 2005 – Plaintiff complained of swelling, itching, and burning in her feet and lower legs. (Tr. 250). On November 4, 2005, Plaintiff complained of discoloration, pain, and warmth in her right leg. (Tr. 253). She said she had burned that leg years earlier and continued to have problems with it. (Tr. 253). Plaintiff presented in no acute distress, with a full range of motion in her extremities. (Tr. 253). There was no edema in her extremities, but her right leg showed some erythema (redness) over her distal right shin, with warmth and some tenderness. (Tr. 253). She was diagnosed with right lower extremity cellulitis and intermittent peripheral edema. (Tr. 253).

On February 13, 2006, Plaintiff complained of pain and swelling in her lower legs. (Tr. 254). Her right leg was red over the shin to mid-calf with an open ulcer, and her left leg was red over the mid-shin and warm to the touch. (Tr. 254). Plaintiff's motor, sensory, and reflex exams were normal, and she had a normal gait. (Tr. 254). She was diagnosed with cellulitis in her bilateral lower extremities, prescribed medication, and instructed to elevate her legs. (Tr. 254). Plaintiff returned

3

on February 17, 2006, again complaining of pain and swelling in her lower legs. (Tr. 256). Notes stated she was "much better" with medication: Though her right leg was still red, it was less swollen, less tender, and did not have drainage. (Tr. 256).

On August 10, 2006, Plaintiff complained of hip pain after falling when her left leg gave out. (Tr. 260). Plaintiff's motor, sensory, and reflex exams were normal, as was her gait. (Tr. 260). She was diagnosed with an acute exacerbation of chronic back pain and told to rest the painful area, stay off work for five days, and treat her pain with heat and hot soaks. (Tr. 260). She was also given medications and instructed to follow up. (Tr. 260). Plaintiff continued to complain of hip pain on August 22, 2006 and said she was fired because pain prevented her from working. (Tr. 267). Physical examination was positive for swelling and pain in her lumbar spine and paraspinal muscles. (Tr. 267). Once again her gait, motor, sensory, and reflex exams were normal. (Tr. 267). On September 26, 2006, x-rays of Plaintiff's lumbar spine revealed moderate discovertebral degenerative changes at L4-S1 and mild degenerative changes at L1-L2 and in the dorsal spine. (Tr. 235).

Plaintiff saw Dr. Kimberly C. Sheets on September 26, 2006 and asked her to fill out disability paperwork, explaining she could not work because pain radiated down her left leg, her left leg gave out on her, and she had been fired from her recent job as a dishwasher "because she missed too many days secondary to back pain." (Tr. 265). Additionally, she said she could not lift heavy things. (Tr. 265). Dr. Sheets diagnosed chronic back pain with radiculopathy, stated she would fill out the paperwork, and ordered an x-ray of Plaintiff's lumbosacral spine. (Tr. 265). The x-ray showed degenerative disc disease and Plaintiff was asked if she would like to see a spine specialist, but she did not wish to do so. (Tr. 265).

4

In November 2006, Plaintiff underwent muscle testing and a physical examination with Dr. Sam N. Ghoubrial. (Tr. 278–81). Her muscle strength was rated as 5/5 and she had normal grasp, manipulation, pinch, and fine coordination in both hands. (Tr. 278). There were no muscle spasms, spasticity, clonus, primitive reflexes, or muscle atrophy. (Tr. 279). Additionally, Plaintiff's range of motion was normal in her cervical spine and upper extremities. (Tr. 279–80). She had a slightly decreased range of motion in her dorsolumbar spine, but normal range of motion in her lower extremities. (Tr. 280–81, 284). Plaintiff told Dr. Ghoubrial she could not work due to back pain that occasionally radiated down her left leg. (Tr. 282). Despite smoking half a pack of cigarettes a day, Plaintiff's lungs were clear to auscultation with no wheezes, rhales, or rhonci. (Tr. 284). Examination of her lower extremities revealed trace edema, but no gross abnormalities. (Tr. 284). Plaintiff could get on and off the exam table without difficulty, heel and toe walk, and walk without a cane or walker. (Tr. 285). Her neurological examination was also normal. (Tr. 285). Based on his evaluation, Dr. Ghoubrial felt Plaintiff "would have no difficulty sitting, walking, lifting, carrying, handling objects, hearing, speaking[,] or traveling." (Tr. 285).

On July 18, 2007, Dr. Willa Caldwell assessed Plaintiff's physical residual functional capacity (RFC). (Tr. 340–47). She found Plaintiff could lift 25 pounds frequently and 50 pounds occasionally; sit, stand, or walk about six hours in an eight-hour day; and was unlimited in pushing and pulling. (Tr. 341). She also found Plaintiff should never climb ladders, ropes, or scaffolds, but assessed no other limitations. (Tr. 342–44).

When Plaintiff presented for medication refills on July 19, 2007, there was "trace edema" in her extremities. (Tr. 351). On August 21, 2007, her extremities were negative for edema, but she complained of being tired. (Tr. 353, 420). Plaintiff complained of back pain rated as a 5/10 on

November 14, 2007. (Tr. 419). Her spine was tender and there was edema in her legs, but she had a full range of motion. (Tr. 419). On November 28, 2007, Plaintiff's physical examination was normal. (Tr. 418). Notes indicated peripheral edema at a January 16, 2008 follow-up appointment. (Tr. 416). On January 25, 2008, Plaintiff's legs had bilateral venous stasis changes and 2+ edema, and she was diagnosed with chronic venous insufficiency. (Tr. 414). Plaintiff had pain in both knees on March 4, 2008 and notes indicated she had been told she needed knee surgery but did not follow through. (Tr. 412). Plaintiff's legs were also swollen. (Tr. 412). Her right knee was tender and itchy, with an old area of edema, redness, and increased warmth. (Tr. 412). She was diagnosed with degenerative joint disease of her knees, referred to orthopedics, and prescribed antibiotics. (Tr. 412). On April 1, 2008, physicians noted stasis dermatitis in Plaintiff's lower legs, with the right worse than the left. (Tr. 411). Plaintiff said the condition had returned despite antibiotics helping for a while. (Tr. 413). Plaintiff had a brown discoloration on her right lower leg from an old burn, but did not have any open areas, warmth, or redness. (Tr. 413). Plaintiff also had a superficial scab she had been scratching. (Tr. 413).

On April 14, 2008, Plaintiff went to Dr. Cheung Cho Yue for a physical, and Dr. Yue had difficulty eliciting information from her. (Tr. 519). She said her left knee bothered her if she walked too far and she could not move in bed at night because bending hurt her knee. (Tr. 519). Notes indicated Plaintiff was working at a truck stop as a dishwasher. (Tr. 512). She said she had tried to move in with her daughters, but they took her to the homeless shelter. (Tr. 512). Plaintiff's right leg had prominent varicosities and hyperpigmentation. (Tr. 512). Neither knee was warm, but she was too obese to detect joint effusion, there was genu valgus in both knees, and her left knee was tender on the lateral side. (Tr. 512). Dr. Yue diagnosed knee pain, more than likely with significant lateral

compartment osteoarthritis, obesity that "clearly contribut[ed] to her problem", high blood pressure, history of thyroid cancer, and cigarette abuse. (Tr. 512). He recommended Plaintiff exercise to improve her pain and weight, but Plaintiff said she did not care and was not going to go to her orthopedic appointment the following week. (Tr. 512).

Plaintiff went to the hospital on April 15, 2008 after she fell when her left knee gave out, presenting with bilateral knee bruising and swelling. (Tr. 509, 511, 514, 517). She was in moderate distress but had a normal gait, normal sensation, and normal reflexes. (Tr. 518). She was given pain medications, and x-rays showed mild degenerative changes. (Tr. 484, 514). Plaintiff's right knee had extensive degenerative changes at the knee joint, with medial compartment narrowing and tricompartmental spurring, along with a large varicosity in the soft tissues and enthesophytes at the patella and distal femoral surfaces. (Tr. 511).

On April 21, 2008, Plaintiff went to orthopedist Dr. Richard Aguilera and complained of knee pain. (Tr. 503). Examination revealed right knee arthritic pain and left knee joint swelling but no muscle weakness. (Tr. 503). Her right knee was positive for hyperpigmented patches, swelling, bruising without effusion, tenderness, varicosities, and slightly decreased strength due to pain, but it had full range of motion. (Tr. 504). Her left knee was positive for bruising, effusion, tenderness, varicosities, and slightly diminished strength, but also had full range of motion. (Tr. 504). Dr. Aguilera diagnosed contusions to her bilateral knees, gave Plaintiff elastic knee supports, and prescribed Motrin to manage her pain. (Tr. 504).

On May 1, 2008, Plaintiff had a left foot wound and admitted to walking a lot recently. (Tr. 408). She was referred to podiatry for wound care, given stockings and ointments, and advised to rest her legs. (Tr. 408). On May 12, 2008, Plaintiff presented with a rash and bilateral leg pain. (Tr.

409). Plaintiff's right leg was positive for itching. (Tr. 409). Her left knee was red and slightly warm and tender, and she had a bilateral rash over her buttocks and thighs. (Tr. 410). She was diagnosed with cellulitis and contact dermatitis and prescribed medications. (Tr. 410).

Plaintiff followed up on her left leg rash and presumed cellulitis on May 14, 2008. (Tr. 401). She was tolerating her medications, and her lesions had decreased in size. (Tr. 401). Plaintiff's range of motion was normal. (Tr. 402). She had a lesion on her left leg, but it was not warm or weeping fluid. (Tr. 402). She had other lesions that were red and weeping, multiple varicose veins in both legs, and was positive for stasis dermatitis in her lower legs. (Tr. 402). The physician diagnosed left lower leg cellulitis, noting the condition responded well to treatment. (Tr. 402). Plaintiff was instructed not to use irritating soaps and told to apply Vaseline or lotion to prevent future skin problems. (Tr. 403).

Plaintiff followed up for dermatitis on her right hip on May 23, 2008 and complained of radiating hip pain when walking, but was not presently in pain. (Tr. 404). She also said she had pain in both knees and had been referred to an orthopedic physician after x-rays, but had not set up the appointment. (Tr. 404). Plaintiff's lower left leg was positive for edema, but the rash seemed diminished. (Tr. 405). Examination was also positive for varicose veins and stasis dermatitis on the right. (Tr. 405). Plaintiff's straight leg raise test was negative, and she was positive for pain near the sacroiliac joint. (Tr. 405). She was diagnosed with left hip pain secondary to sacroiliac joint pain and spasms, for which she was told to take ibuprofen and stretch. (Tr. 405). She was also diagnosed with left lower extremity cellulitis and told her elevate her leg at night and walk to increase her mobility; additionally, she was told she could try Ace wraps once her infection cleared and was referred to orthopedics. (Tr. 405). On June 9, 2008, Plaintiff reported her symptoms were improved

8

and she no longer had a rash after restarting her medication. (Tr. 387). Her extremities were negative

for edema and notes indicated Plaintiff was going to work with someone about seeing an orthopedic

physician. (Tr. 387).

On November 6, 2008, a pulmonary function test showed severe obstructive ventilatory

impairment, consistent with a diagnosis of COPD. (Tr. 549). Plaintiff complained of a rash, lower

extremity swelling, and snoring with excessive daytime sleepiness on December 15, 2008. (Tr. 543).

She was well-appearing and comfortable, with slight bilateral swelling in her lower extremities,

mottling and venous stasis changes on her previously-burned right leg, a small healed dry-based

ulceration, and no warmth or redness. (Tr. 544). Plaintiff was prescribed medication and told to eat

a low-salt diet. (Tr. 544). On October 6, 2008, Plaintiff's neurological exam was negative for

symptoms, her extremities had no edema or evidence of synovitis, and she had 5/5 strength and

normal reflexes. (Tr. 453).

Plaintiff went to the emergency room on October 15, 2008, complained of shortness of

breath, and was diagnosed with an acute asthma exacerbation. (Tr. 431, 463, 465). Notes indicated

she was a chronic smoker, but she did not feel short of breath at the time she was examined. (Tr.

465). Additionally, she complained of swelling in her legs, varicose veins, and old burns. (Tr. 465).

She had a normal physical examination, with no skin problems, 5/5 strength, normal sensation,

normal range of motion. (Tr. 467). A chest x-ray showed no acute cardiopulmonary disease and

Plaintiff felt "a lot better" prior to discharge, denying shortness of breath or chest pain. (Tr. 430,

440).

On October 24, 2008, Plaintiff went to the emergency room complaining of bilateral hip and

knee pain, alleviated by ibuprofen. (Tr. 432). Plaintiff denied back pain or sensory symptoms,

looked comfortable, and had no swelling or redness around her knees. (Tr. 432–33). She was positive for knee crepitus and hip tenderness, but had no reproducible tenderness on external rotation of the hip. (Tr. 433). There were also chronic venous changes on her right lower extremity "with [a] small skin break" on her shin, which Plaintiff attributed to scratching. (Tr. 433). Plaintiff had varicose veins in her right leg and her reflexes could not be elicited, but she had 5/5 power in both legs and no edema. (Tr. 433). She was diagnosed with osteoarthritis and given a trial of Voltaren. (Tr. 432). At an unrelated appointment several days later, Plaintiff had no lower extremity edema or calf tenderness. (Tr. 423, 425).

On March 28, 2009, Plaintiff had a sleep study performed after she complained of difficulty falling asleep, snoring, difficulty maintaining sleep, waking with a headache, not feeling refreshed after sleep, and excessive daytime sleepiness. (Tr. 536). The results indicated Plaintiff was a poor sleeper and she was diagnosed with clinically significant obstructive sleep apnea. (Tr. 536–37). On April 6, 2009, Plaintiff followed up to discuss her lab results and there was trace edema in her left lower extremity, with +1 edema and venous stasis changes in her right lower extremity. (Tr. 533).

Plaintiff saw podiatrist Dr. Lisa S. Roth on May 28, 2009 and denied pain but said she was klutzy and tripped and fell every day if she walked long distances. (Tr. 522). Plaintiff could stand without holding something for balance, but her feet were "very cavus in nature and extremely c-shaped." (Tr. 522). Dr. Roth said orthotics might help, but not entirely solve, Plaintiff's balance problems, and she diagnosed her with talipes cavus, congenital metatarsus varus, and gait abnormality. (Tr. 522).

Plaintiff underwent another sleep study on October 13, 2009, which showed she was a poor sleeper and resulted in diagnoses of obstructive sleep apnea, obesity, and possible periodic limb

10

movement disorder. (Tr. 556, 558). On November 3, 2009, Plaintiff attended a sleep medicine follow-up appointment. (Tr. 552). She was alert and in no acute distress, with a few scattered superficial lesions on her right lower leg but no edema, clubbing, or cyanosis. (Tr. 555). Notes stated she responded optimally to the CPAP machine. (Tr. 553).

On December 9, 2009, Plaintiff went to a clinic for medication refills and denied breathing problems but complained of intermittent itching and mild pain in her right leg due to her past burn. (Tr. 565). Plaintiff's examination was normal, with respiratory, musculoskeletal, and neurological examinations that were negative for symptoms. (Tr. 567). Among other things, this meant that despite +2 edema in her lower extremities, Plaintiff had normal strength and range of motion and no arthritic pain, joint swelling, weakness, or gait problems. (Tr. 567). She had an ulcer on her right leg but no acute inflammation, warmth, or redness. (TR. 567). Despite a history of thyroid cancer, Plaintiff did not want to see an endocrinologist. (Tr. 568). She was referred to dermatology for treatment of her chronic right leg ulcer. (Tr. 568).

Plaintiff went to a weight management clinic on August 17, 2010, explaining she was motivated to institute lifestyle changes because she wanted to be more active and happy with herself. (Tr. 625). Notes stated Plaintiff had quit smoking after being diagnosed with COPD, and she said she used her CPAP machine every other night. (Tr. 628). Plaintiff had no gait problems despite pain in her lower back and feet. (Tr. 628). She said on a daily basis she ate three meals, including dinners such as roasts with vegetables, baked chicken, or fried pork chops with sides such as mashed potatoes, vegetables, or fries. (Tr. 629). She lived in an apartment with her boyfriend, did the shopping, and shared cooking duties with him. (Tr. 630). Plaintiff said she completed most home activities but did not exercise. (Tr. 630). She had a right lower leg ulcer with crusting, redness, and

11

some tenderness. (Tr. 630). Her back range of motion was normal, she had good breath sounds, and her extremities were normal, with no edema. (Tr. 630). Her neurological examination was also normal. (Tr. 630). The nurse practitioner described Plaintiff as an obese patient with multiple comorbid conditions. (Tr. 632). She noted Plaintiff had a very sedentary lifestyle, medications that could promote weight gain, and a diet that could be high in fat, and she spent a significant amount of time counseling Plaintiff on the role of diet and exercise in weight loss. (Tr. 632).

On August 25, 2010, Plaintiff went to vascular surgeon Dr. Christopher Smith for evaluation of the chronic wound on her right leg, which Plaintiff admitted to picking. (Tr. 644). Plaintiff's pulses were nonpalpable in her extremities. (Tr. 646). Her dorsalis pedis (DP) pulses were monophasic and her posterior tibial (PT) pulses were triphasic on doppler exam. (Tr. 646). There was also mild edema in her left foot and +1 pitting edema in her right leg. (Tr. 646). The ulcer on Plaintiff's leg was three-by-four centimeters, had mild serous exudate with periwound crusting, and had a six centimeter perimeter of "blanchable erythema", but no signs of infection. (Tr. 646). Dr. Smith applied an Unna boot and instructed Plaintiff to use over the counter medications to treat pain. (Tr. 647). She was to return weekly to have the Unna boot changed until the wound healed. (Tr. 647).

Plaintiff returned to have her dressing changed on September 16, 2010 and her wound was smaller, with redness, edema, and a scant amount of bloody drainage. (Tr. 653). Plaintiff was not in pain at that time. (Tr. 654).

On September 21, 2010, Plaintiff attended a weight management appointment and said she occasionally performed upper body exercises. (Tr. 657). Plaintiff said she hated her CPAP machine and continued to smoke a pack and a half of cigarettes each day. (Tr. 658). Her neurological

12

examination was normal and musculoskeletal examination revealed no arthritic pain, joint swelling, or weakness. (Tr. 657–58). She was feeling well, without complaints, and had lost five pounds. (Tr. 662, 664).

Plaintiff had her Unna boot dressing changed again on September 23, 2010. (Tr. 672). She was not in pain and the wound was small, moist, and red and yellow in color, with a small amount of drainage. (Tr. 672). By September 30, 2010, Plaintiff's wound had healed to a small scab with no redness, edema, or drainage. (Tr. 686). When she returned on October 7, 2010, Plaintiff was in pain and her scabbed areas were sore from scratching, but the ulcer was healing with a dry scab in place and no redness, edema, or drainage. (Tr. 687). Her dressing was changed and she was measured for compression stockings, which she was instructed to wear daily. (Tr. 687, 694).

Plaintiff complained of a chest cold on October 20, 2010. (Tr. 690). She said she was smoking less than half a pack of cigarettes each day. (Tr. 690). There was no acute COPD-exacerbation, Plaintiff was diagnosed with probable bronchitis, and she was given an antibiotic. (Tr. 692). On November 29, 2010, Plaintiff thought she had bronchitis and was still smoking a pack a day after unsuccessfully trying to quit smoking. (Tr. 695). Plaintiff's respiratory exam was positive for wheezing, cough, and dyspnea on exertion. (Tr. 696). She was not in distress, there was no clubbing, cyanosis, or lymphadenopathy, and she could move all limbs without gross focal neurological deficits. (Tr. 698). Plaintiff was diagnosed with a COPD exacerbation and prescribed medications. (Tr. 698–99).

ALJ Hearing

At the hearing, Plaintiff amended her alleged onset date to October 12, 2005 to coincide with her fiftieth birthday. (Tr. 33–35). Plaintiff testified she liked her last job as a dishwasher, got along

13

with her supervisor and coworkers, and would probably still be working there if her husband's death had not required her to stay home with her daughter. (Tr. 38–39). Further, she could not clarify when her medical conditions would have caused her to stop working. (Tr. 47–48). She said she had difficulty standing and sitting due to lower back disc problems, shortness of breath with walking or doing heavy lifting, and was supposed to use a cane but did not use one. (Tr. 40, 44, 48–49). Plaintiff's attorney asked her about the cellulitis in her leg, and Plaintiff testified the condition was no longer an issue for her. (Tr. 49–50). She explained she lived with her boyfriend, who did not work and was also pursuing social security disability benefits. (Tr. 42–43).

The VE classified Plaintiff's past work as deli assistant, packager, fast food worker, and dishwasher. (*See* Tr. 53–59). The ALJ posed a hypothetical asking the VE to consider a person of Plaintiff's age, education, and work experience, who could lift 25 pounds frequently, 50 pounds occasionally; stand, walk, or sit for about six hours; and who could not work around high concentrations of dust, fumes, gases, or tobacco smoke.[1] (Tr. 61–62). In response, the VE testified such a person could perform all Plaintiff's past relevant work except the job as a packager. (Tr. 62).

ALJ Decision

The ALJ found Plaintiff's date last insured was September 30, 2008 and she had not engaged in substantial gainful activity after her alleged onset date. (Tr. 16–17). The ALJ then found Plaintiff had severe impairments "best described" as obesity, arthritis, degenerative disc disease, COPD, obstructive sleep apnea, hypothyroidism, and various psychological conditions. (Tr. 17). All other impairments mentioned in the record the ALJ found not severe because there was insufficient evidence to show they significantly interfered with Plaintiff's ability to perform basic work

---

1. The ALJ also opposed mental limitations not at issue in this appeal. (Tr. 61).

14

activities. (Tr. 17). The ALJ found Plaintiff's severe impairments did not meet or medically equal

an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 19). He concluded she could

perform medium work with the same limitations posed to the VE in the hypothetical. (Tr. 20,

61–62). The ALJ explained  there was no record of ongoing and significant sensory, reflex, motor

loss, or muscle atrophy in Plaintiff's extremities, Plaintiff was neurologically intact and continued

to regularly smoke despite her COPD, and she engaged in "a fairly wide range of activities . . .

incompatible with an individual having disabling symptoms." (Tr. 21). Further, he noted Plaintiff's

"sporadic and limited work" as an adult prior to her alleged onset date "called into question her

motivation to work . . . irrespective of her medical condition." (Tr. 22).

Based on VE testimony, the ALJ found Plaintiff could perform her past relevant work as a

delicatessen assistant, fast food worker, or dishwasher. (Tr. 22–23, n.39–40). Thus, the ALJ found

Plaintiff not disabled. (Tr. 24). The Appeals Council denied review (Tr. 1), making the ALJ's

decision the final decision of the Commissioner.

### STANDARD OF REVIEW

In  reviewing  the  denial  of  Social  Security  benefits,  the  Court  "must  affirm  the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence

is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health &*

*Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact

if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474

F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

> 1. Was the claimant engaged in a substantial gainful activity?
>
> 2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?
>
> 3. Does the severe impairment meet one of the listed impairments?
>
> 4. What is claimant's residual functional capacity and can she perform past relevant work?
>
> 5. Can the claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age,

16

education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff alleges the ALJ erred two ways. First, she argues the ALJ erred by failing to find chronic right leg cellulitis and chronic venous stasis were severe impairments. (Doc. 14, at 6–9). Related to this argument, she also contends the ALJ's RFC determination was flawed because the ALJ failed to properly consider evidence of her cellulitis and chronic venous stasis. (Doc. 14, at 9–11). She argues if the ALJ had considered those impairments severe, they would have impacted her ability to stand and walk such that she would have been limited to sedentary work, which would have made her disabled as of October 12, 2005. (Doc. 14, at 9).

Severe Impairments

Plaintiff's first argument stems from the ALJ's obligation at step two of the disability analysis to determine whether a claimant suffers a "severe" impairment  – one which substantially limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576-77 (6th Cir. 2009). But the regulations do not require the ALJ to designate each impairment as "severe" or "non-severe"; rather, the determination at step two is merely a threshold inquiry. 20 C.F.R. § 404.1520(a)(4)(ii). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat*, 359 F. App'x at 576 (quoting SSR 96-8p, 1996 WL 374184,  at *5) (emphasis in original). In other words, if a claimant

17

has at least one severe impairment, the ALJ must continue the disability evaluation and consider all the limitations caused by the claimant's impairments, severe or not. And when an ALJ considers all a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments does not constitute reversible error. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

Plaintiff's complaint is not that the ALJ failed to find she suffered from any severe impairment – indeed she could not argue this, given the ALJ found Plaintiff suffered from nine severe impairments. (Tr. 17). Rather, Plaintiff argues the ALJ erred because he did not specifically find chronic cellulitis and chronic venous stasis "severe". (Doc. 14, at 6–9). But this argument does Plaintiff no good. The ALJ did find severe impairments at step two, and he took into consideration the symptoms Plaintiff contends resulted from the other conditions. Plaintiff notes those conditions caused pain and swelling of her lower extremities, exacerbated by prolonged standing or walking. (Doc. 14, at 8). The ALJ specifically noted Plaintiff's complaints of difficulty with standing and walking and restricted her to medium work, but noted her medical record consistently showed normal physical examinations despite her complaints. (Tr. 20–21).

"[T]he mere diagnosis of an impairment does not indicate the severity of that impairment." *Mikesell v. Astrue*, 2012 WL 1288733 , *adopted by* 2012 WL 1288724 (N.D. Ohio 2012) (citing *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988)). And in Plaintiff's case, there was little if any evidence regarding how Plaintiff's chronic cellulitis and venous stasis affected her functioning. Despite occasional notations that Plaintiff should elevate her legs (Tr. 254, 405), the overwhelming evidence showed Plaintiff could treat her cellulitis and chronic venous stasis with

18

conservative treatment including bandages, antibiotics, ointments, over-the-counter pain medication, a low-salt diet, and compression stockings. (Tr. 256, 387, 405, 408, 412, 544, 647, 653, 686–87, 694). Plaintiff also ignores that in addition to recommending elevating her legs at night, one physician recommended she walk *more* frequently. (Tr. 405). The evidence showed Plaintiff admitted to picking at or scratching her wounds (Tr. 413, 433, 644, 687, 688), and there was no objective evidence suggesting these conditions impacted her ability to work. She was generally in no acute distress with no significant edema, and her gait, motor strength, range of motion, reflexes, and sensation continued to be normal while doctors treated her for the conditions. (Tr. 253–54, 260, 267, 271–81, 284–85, 353, 387, 402, 418–19, 423, 425, 432–33, 453, 467, 503–04, 518, 555, 567, 628, 630, 657–58, 698). The ALJ took into account Plaintiff's pain by limiting her ability to sit, stand, or walk. Because the ALJ found Plaintiff suffered from severe impairments and considered Plaintiff's symptoms in the remaining steps of the disability determination, any failure to find additional severe impairments did not constitute reversible error. *See Nejat*, 359 F. App'x at 577. This is particularly true given Plaintiff's explicit testimony that chronic cellulitis was "not an issue" for her any longer. (Tr. 50).

RFC Assessment

Plaintiff also argues substantial evidence did not support the ALJ's RFC determination, focusing on her belief that had he considered additional severe impairments, her RFC would have been different and she would have been found disabled. (Doc. 14, at 9–11). For largely the same reasons discussed above, Plaintiff is wrong and the ALJ did not err.

RFC is a measurement of the most a plaintiff can do despite her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). It represents "an assessment of an individual's ability to do sustained

19

work-related physical and mental activities in a work setting" for eight hours a day, five days a week, or an equivalent work schedule. SSR 96-8p, 1996 WL 374184, *1. The RFC assessment must be based on all relevant evidence, "such as medical history, medical signs and laboratory findings, the effects of treatment . . . , reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, including pain . . . , evidence from attempts to work, need for a structured living environment, and work evaluations, if available." *Id.* at *5.

Substantial evidence supports the ALJ's RFC determination that Plaintiff could lift and carry 25 pounds frequently and 50 pounds occasionally; stand, sit, or walk for six hours in an eight-hour day; and must avoid exposure to high concentrations of dust, fumes, gases, or tobacco smoke. As the ALJ mentioned, the objective evidence did not support greater limitations. (*See* Tr. 21). The overwhelming majority of Plaintiff's physical examinations showed no loss of motor strength and normal range of motion, gait, reflexes, and sensation. (Tr. 253–54, 260, 267, 278–81, 285, 402, 418–19, 433, 453, 467, 503–04, 518, 567, 628, 630, 657–58, 698). Plaintiff testified she would probably still be working her dishwasher job if her husband had not passed away, and she was unable to explain when she would have become unable to work if that had not occurred. (Tr. 38–39, 47–48). Moreover, though Plaintiff complains chronic cellulitis should have been accounted for in the RFC, this condition responded well to treatment and at the hearing she admitted it was no longer an issue for her. (Tr. 49–50, 402, 653–54, 672, 686–88).

Further, as the ALJ explained, Plaintiff could engage in a fairly wide range of activities despite her complaints of disabling symptoms. Plaintiff reported several times that she could care for herself, cook, shop, and perform household chores. (Tr. 171–74, 194–96, 274, 304, 360, 630). She said she visited her daughter, went to church, went out to eat or to the movies, and played

20

computer games all day. (Tr. 175, 194, 197, 274–75, 304). At one point, she told a physician she was extremely busy, had moved in with a friend, and had been going shopping and to festivals. (Tr. 360). She even reported riding a friend's motorcycle and caring for friends' dogs. (Tr. 194, 292). Plaintiff's objectively normal physical examinations, medical improvement with conservative treatment, statements that her cellulitis was no longer a problem, and relatively robust and normal level of daily activities provided substantial evidence justifying the ALJ's RFC determination.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision supported by substantial evidence. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

    s/James R. Knepp, II    
United States Magistrate Judge
